## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA ARCHIBALD, | ) | |
| | ) | **No. 12 CV 326** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | **January 16, 2013** |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Melissa Archibald seeks review of the final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), 42 U.S.C. §§ 423(d)(2), 1382c(a). Archibald asks the court to reverse the Commissioner's decision and remand the case for further proceedings. For the following reasons, Archibald's motion for summary judgment is denied:

### Procedural History

Archibald protectively applied for DIB and SSI on March 19, 2009, alleging disability beginning on March 29, 2009, as a result of reflex sympathetic dystrophy ("RSD" or "RSDS"), and an injury to her right hand. (Administrative Record ("A.R.") 190-91, 192-94.) The Commissioner denied her applications on June 19, 2009, and again on reconsideration on October 22, 2009. (Id. at 91-94, 95-98, 103-05, 107-09.) Archibald thereafter requested, and received, a hearing before an administrative law judge ("ALJ") on December 3, 2009.

(Id. at 27-90, 111-12, 127-33.)  On July 29, 2010, the ALJ issued a decision finding Archibald not disabled.  (Id. at 11-22.)  The Appeals Council denied Archibald's request for review on December 6, 2011 (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).  Archibald initiated this civil action for judicial review of the Commissioner's final decision, 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of this court, *see* 28 U.S.C. § 636(c).

## Background

### A.    Medical Evidence

Archibald, who is 49 years old, claims that her disability stems from an injury she suffered in December 2007 when, while working as a security guard, her right hand was caught between a gate and a latch.  Her right thumb became numb immediately, and she noticed swelling and pain.  (A.R. 421.)  That same day, she went to the emergency room, and X-rays showed no fracture.  (Id.)  The pain and swelling persisted, and Archibald observed tingling and numbness.  (Id.)  Archibald saw Dr. Mary Ling, an orthopedist, who diagnosed her with a sprain of the carpometacarpal and metacarpophalangeal joint, noting mild swelling at Archibald's right thumb and tenderness in the joint areas.  (Id. at 421-22.)  Archibald was able to actively flex and extend joints of her thumb, though with some pain, and sensation was slightly altered to light touch.  (Id. at 421.)  Dr. Ling recommended, and Archibald proceeded with, splint protection.  (Id. at 422.)  Archibald continued to report increasing pain, tingling, and numbness, and movement of her pain into other areas of her body.  (Id. at 398-405, 407, 411, 413, 415, 419.)  She requested a note to be excused from work, but

Dr. Ling declined to issue one, explaining that Archibald was still able to use her uninjured hand. (Id. at 418.) An MRI of Archibald's right fingers and thumb returned unremarkable findings (id. at 413, 424), and electromyography testing—designed to evaluate electrical activity produced by nerves and skeletal muscles—also revealed normal findings (id. at 413, 416).

Archibald regularly saw Dr. Ling in 2008. Dr. Ling noted that Archibald's right hand exhibited no gross deformity, swelling, or discoloration and that she could actively flex and extend her wrists and digits fully. (Id. at 407, 411.) There was a positive Tinel's sign—tingling in the irritated nerve—over the thumb metacarpal (the site of her injury), and Archibald had reduced grip strength in her right hand. (Id. at 405, 411.) Dr. Ling recommended occupational therapy and the increased use of Archibald's right hand to strengthen it. (Id. at 407, 410, 414.) Yet Archibald reported persistent pain. To manage her pain, Archibald took several pain medications—Tylenol, Ibuprofen, Norco, Naprosyn, Vicodin, Darvocet, and Percocet—underwent two cortisone carpal tunnel injections, and applied Lidoderm patches. (Id. at 318, 347, 399-401, 404-05, 407, 409, 415.) Archibald also continued to wear a splint. (Id. at 398, 403-04.)

When Dr. Ling recommended a second opinion, Dr. David Tulipan, an orthopedist, examined Archibald in January 2009. He noted that she exhibited marked pain withdrawal behaviors when he attempted to manipulate her hand and that she had limited wrist range of motion. (Id. at 318.) Dr. Tulipan opined that Archibald had "what appear[ed] mostly to be a pain management problem." (Id. at 319.) He noted her "somewhat" flat affect and pain

3

restriction behaviors, which were, he observed, consistent with chronic pain. (Id.) The only objective finding that Dr. Tulipan gleaned from the examination was a suggestion of carpal tunnel syndrome. (Id.) Observing that Archibald's pain was "certainly way out of proportion to the injury described," Dr. Tulipan recommended electrodiagnostic studies and evaluations by a pain management specialist and a psychologist. (Id.)

The electrodiagnostic studies returned normal results. (Id. at 392, 425.) Dr. Vinita Mathew who performed the tests noted that Archibald's symptoms were "more suggestive of complex regional pain syndrome ["CRPS"] or [RSD]" without neuropathy. (Id. at 395.) Still feeling persistent pain and reporting that the pain was spreading through her entire right upper extremity, neck, back, and left hand, Archibald requested stronger prescription medications. (Id. at 394, 460-62, 464-66.) Dr. Ling declined to prescribe them—though she continued to prescribe Lidoderm patches—and believing no surgical interventions to be available, recommended pain management treatment. (Id. at 392-94, 435.) Dr. Ling also recommended a Functional Capacity Evaluation to determine whether Archibald had any permanent work restrictions. (Id. at 433-34, 460-61.)

In March 2009, Dr. Edward Yang, a pain management specialist, evaluated Archibald. He found that she had allodynia—pain from non-painful stimulation such as a light touch—over her entire right hand to her elbow, severely limited range of motion in her right hand and grip strength, and a definite decrease in temperature in her right fingertips. (Id. at 348.) Dr. Yang also noted that her right upper extremity motor strength was intact, she had full range of motion in her cervical spine, and there was no cyanosis. (Id.) He concluded

that Archibald's pain was "out of proportion" to her injury and seemed consistent with CRPS. (Id.) Later that month, Archibald reported to the emergency room complaining of chest and back pain. (Id. at 334, 465.) But her chest x-ray and physical examination were within normal limits, and she was discharged. (Id. at 341, 343.)

In May 2009, Archibald's mother, Shirley Lahr, completed a Third Party Function Report. Lahr, who was living with Archibald at the time, noted that Archibald was on the computer daily taking an online course, cared for her cat, talked to her friends daily on the phone, and shopped. (Id. at 232, 234-35.) Lahr reported that Archibald was capable of doing laundry, ironing, and light cleaning but that she had difficulty lifting, reaching, squatting, walking, using her hands, bending, sitting, standing, and kneeling. (Id. at 234, 236.) Lahr also observed that Archibald had difficulty concentrating and difficulty following instructions. (Id. at 236.) Finally, Lahr noted that Archibald had no difficulty getting along with others, but had become less social since her injury. (Id.)

Dr. Calixto Aquino, a state-agency physician, submitted a Physical Residual Functional Capacity ("RFC") Assessment in June 2009. Dr. Aquino opined that Archibald could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk about six hours in an eight-hour workday, sit for about six hours, and was unlimited in her pushing and pulling. (Id. at 438.) Dr. Aquino further opined that Archibald was limited in reaching and handling, noting that even though motor strength was intact, she exhibited pain with the slightest touch, swelling, and allodynia. (Id. at 440.) He opined that she was

unable to use her right hand and arm due to CRPS, but added that her left hand was unaffected.  (Id.)

When Archibald met with Dr. Ling the following month, she reported pain in her right upper extremity and difficulties in her lower extremities, stating that she believed her "'RSD' ha[d] spread."  (Id. at 456.)  Dr. Ling observed no obvious discoloration or swelling in Archibald's right upper extremity but noted that she demonstrated withdrawal of the extremity when light touch was applied.  (Id.)  Dr. Ling declined to place Archibald on strong narcotic pain medication, instead offering Ultracet, and recommended treatment at a pain management center.  (Id. at 457.)  Dr. Ling informed Archibald that "even if the 'RSD' was present, there is a chance that things will improve from today's status."  (Id.)

One month later, in August 2009, Archibald sought treatment from Dr. Dinora Ingberman.  She reported to Dr. Ingberman that the pain had spread to other parts of her body as a stabbing pain.  (Id. at 478.)  Archibald told Dr. Ingberman that she used her left upper extremity for most of her activities and that her right upper extremity was at only one to two percent of its function prior to her injury.  (Id.)  The only painless activity, she said, that she could perform with her hands was typing 70 words per minute; pre-injury, she was able to type 90 words per minute.  (Id.)  She informed the doctor that she had difficulty balancing and started using a cane for walking in March.  (Id. at 479.)  Archibald also noted a problem with concentration and memory, slurred speech, and difficulty sleeping.  (Id.)

Dr. Ingberman noted an unremarkable gait and normal lumbar and cervical range of motion.  (Id.)  The doctor also observed that Archibald had significant limitation of bilateral

hip range of motion, deficits in her right shoulder range of motion, and decreased sensibility in her left thigh. (Id.) Archibald reported increased pain in her left leg when walking on her toes and that she could not squat. (Id.) Dr. Ingberman observed that Archibald was guarding her right upper extremity when touched but less so when distracted, and that she did not complain during the muscle stretch reflex testing but reported extreme hypersensitivity in the right forearm at the slightest touch. (Id.) The doctor also observed that she exhibited exaggerated pain behavior when withdrawing her right hand after taking off her socks, noting that she then used both hands to put her socks and shoes on. (Id.) Dr. Ingberman diagnosed Archibald with chronic pain syndrome, noting that she did not meet the criteria for a diagnosis of CRPS. (Id. at 473, 479.) The doctor prescribed progressive resistive intensive daily exercise ("PRIDE") treatment for several weeks, suggesting that Archibald would then be at maximum medical improvement and be able to return to work. (Id. at 472, 476.) Shortly after, Archibald asked for a note excusing her from work, but Dr. Ingberman declined to issue one. (Id. at 474.)

Later that month, Archibald saw Neil Mahoney, Ph.D., for a psychological evaluation. (Id. at 481.) She reported that at times she felt depressed but had undergone no formal treatment or taken antidepressants, and neither were recommended. (Id. at 482.) She denied any drug-seeking behavior or suicidal ideations, but had thoughts that life might not be worth living. (Id. at 482-83.) Dr. Mahoney observed no impairment of her concentration, attention, or memory during the conversation and noted that she demonstrated the full range of affect. (Id. at 483.) He diagnosed Archibald with psychological factors affecting her medical

condition and ruled out a personality disorder.  (Id. at 484.)  Noting inconsistences in her physical and occupational therapy examinations, he observed that her complaints of pain seemed extreme and unusual.  (Id.)  He also recommended PRIDE.  (Id. at 483-84.)

In September 2009, orthopedic surgeon, Dr. Theodore Suchy, D.O., conducted an independent medical evaluation of Archibald.  (Id. at 545.)  Archibald complained of numbness to her right hand and characterized her generalized pain as a 10/10.  (Id. at 546.)  Dr. Suchy's examination revealed good pulses but obvious color and temperature changes in her right hand when compared to her left.  (Id. at 547.)  He noted decreased sensation to her ulnar and median nerve, decreased right grip strength, and Archibald's ability to make only an 85 percent fist.  (Id.)  Archibald, he observed, had pain with any wrist motion and pain and tenderness over her wrist, thumb, and carpometacarpal joint.  (Id.)  Archibald was also hypersensitive to light touch.  (Id.)  Dr. Suchy diagnosed Archibald with a contusion of her right hand with "subjective complaints outweighing [the] objective findings."  (Id. at 548.)  He noted that Archibald appeared to have developed CRPS or RSD post-injury, and while she was not at maximum medical improvement, she could perform light work with no work performed by her right hand.  (Id.)  He recommended aggressive occupational therapy, an evaluation for a stellate ganglion block, and a psychological evaluation.  (Id.)

The following month, in October 2009, Archibald sought a consultation with psychologist Joan Hakimi, Psy.D.  Dr. Hakimi observed that Archibald walked with a cane and had her right hand in a brace, which, when removed by Archibald, caused pain.  (Id. at 498.)  Dr. Hakimi also observed significant temperature differences in places on her hand and

arm and that Archibald complained of pain in response to even a very light touch. (Id.) Archibald reported that she had no history of psychiatric or substance abuse issues, was not taking pain medication because workmen's compensation would not approve it, and was receiving pain management therapy. (Id. at 499.) She also informed Dr. Hakimi that she "lost all her friends" because of her injury. (Id.) Archibald said that she was taking an online course but found it difficult to study because the RSD affected her short-term memory. (Id.) Archibald related feelings of hopelessness, helplessness, and anhedonia and admitted to thinking about suicide daily because of the pain, though she did not act on these thoughts. (Id. at 499-500.) Dr. Hakimi found no evidence of a formal thought disorder and diagnosed her with depressive reaction secondary to a chronic medical condition. (Id. at 499, 501.) Later that month, Ronald Havens, Ph.D., completed a Psychiatric Review Technique, confirming Dr. Hakimi's diagnosis. (Id. at 507.) He noted that Archibald had mild limitations in activities of daily living; mild difficulties in maintaining social function; mild difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Id. at 514.)

The following year, in April 2010, Archibald sought treatment from Dr. Arnold Farr for pain management. (Id. at 535.) He observed right hand tenderness, reduced grip strength, and bilateral pain. (Id.) Noting very little objective findings, Dr. Farr diagnosed her with pain secondary to CRPS and prescribed a transcutaneous electrical nerve stimulation ("TENS") unit—a device that produces an electric current to stimulate the nerves and muscles—and Nerontin, Oxycodone, and Oxycontin for her pain. (Id.) A few months later,

in July 2010, a family nurse practitioner, Steven Edelman, FNP-BC, wrote a letter noting that Archibald has RSD and that she was unable to work because of her pain. (Id. at 543.)

## B. Archibald's Testimony

At the hearing before the ALJ, Archibald described her ailments, the pain she experiences, and the side effects of her pain medication. According to Archibald, she experiences pain in her right hand and her back, with the pain radiating from the middle of her back up through both her shoulders and down to her left lumbar area. (A.R. 36-37.) She testified that she sweats constantly, suffers hair loss, and experiences involuntary movement in her right arm and hand. (Id. at 68-69.) To alleviate the pain, Archibald takes Oxycodone, Oxycontin, and Gabapentin, which she said provide only about 10 percent relief. (Id. at 45, 71.) She also employs a TENS unit on her right hand. (Id. at 70.) Archibald described the side effects she experiences from her medication, stating that she suffers from irritable bowel syndrome, which causes constipation, rectal bleeding, bowel pains, and diarrhea. (Id. at 72-73.) She testified that these symptoms can occur as often as three weeks out of the month. (Id.) Archibald stated that she also suffers from short-term memory loss, and experiences drowsiness during the day, which in turn requires more afternoon naps. (Id. at 73-74.) She also has difficulty sleeping at night, which affects her energy level during the day. (Id.)

Archibald further described the limitations caused by her pain. She said that she can sit for 15 to 20 minutes before the pain requires her to stand, and she can then stand for about 15 to 20 minutes before the pain returns. (Id. at 37.) The pain diminishes somewhat after she changes her posture, but the pain still prevents her from performing her job duties. (Id.

at 38.)  She can only walk 100 feet before losing her balance, and then she must reset herself to prevent herself from falling down.  (Id.)  According to Archibald, the pain prevents her from using her right arm to do anything.  (Id. at 39.)  She stated that she finds it difficult to hold even a piece of cheese.  (Id.)  She can drive with her left hand—about six miles per week—but not for long distances.  (Id. at 39-40.)  She can also use her left arm to do activities but for only an hour. (Id. at 77.)  When pushed beyond the one-hour limit, she experiences extreme nerve jolts.  (Id.)  Archibald testified that she can perform household chores like laundry, vacuuming, dusting, mopping, and washing dishes, albeit slowly.  (Id. at 43-44).  She can also cook, but she said that the pain makes it difficult for her to hold the pans to stir the food.  (Id. at 44.)  Archibald acknowledged that after her injury, she worked part-time as a gate guard (16 hours a week), but she stopped working because of the pain. (Id. at 75.)  She later explained that she worked part-time hours because those were the only hours that were available.  (Id. at 89.)  She also testified that although she lived with her mother after her injury, in March 2010, she moved to Arizona and currently lives by herself. (Id. at 42, 47-48.)  The reason for the move, she said, was that Chicago's stormy weather caused her to experience pain in her right shoulder down through her hand.  (Id. at 42-43.)

## C.    Medical Expert's Testimony

Dr. Ahmet Semerdjian testified at the hearing as a medical expert ("ME").  He began by recounting Archibald's medical history.  (A.R. 50-55.)  Noting the conflicting medical opinions regarding whether Archibald suffers from CRPS or chronic pain syndrome with a significant overlay of psychological factors, Dr. Semerdjian characterized Archibald's injury

as a soft tissue injury to her right hand.  (Id. at 54-55, 79.)  Explaining that "[CRPS] is a tough diagnosis to make," Dr. Semerdjian added that "there are not any specific tests" that will confirm such a diagnosis, instead "just a complex [set] of findings."  (Id. at 52.)  He testified that if Archibald's examining doctors "used the classic criteria" to evaluate her, "then she has [CRPS], and she has reasons for having pain which is probably amplified by psychological factors."  (Id. at 54-55.)  He also added that he was "not in a position" to say whether Archibald has CRPS.  (Id. at 54.)

## D.  Vocational Expert's Testimony

The ALJ also heard testimony from a vocational expert ("VE"), Linda Gels. She classified Archibald's past work as a gate guard as light, semi-skilled work with a specific vocational preparation score ("SVP")[1] of three, and requiring no more than occasional reaching and handling.  (A.R. 83-84.)  She classified Archibald's past work as a data entry clerk as a sedentary and skilled position, requiring frequent reaching and handling and constant fingering.  (Id. at 84, 86.)  The ALJ then asked the VE whether Archibald would be able to perform her past relevant work if he credited Archibald's testimony regarding her functional limitations.  (Id. at 88.)  The VE responded that if Archibald required unscheduled breaks, she would not be able to perform her past work.  (Id. at 88-89.)

## E.  The ALJ's Decision

---

[1]  An SVP denotes the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

In evaluating Archibald's claim, the ALJ applied the standard five-step sequential inquiry for determining disability, which required him to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If the ALJ finds at step three that the claimant has a severe impairment that does not equal one of the listed impairments, he must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence" before moving on to step four. 20 C.F.R. § 404.1520(e). A claimant's RFC is the "most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to her past work or different available work in the national economy. 20 C.F.R. § 404.1520(e)-(g). If the claimant can perform her past work, she is not disabled. *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984) (stating if claimant "is physically capable of doing the type of work she has done in the past (whether or not she could actually find a job today), she cannot be found to be disabled.").

The ALJ made the following findings: (1) Archibald had not engaged in substantial gainful activity since the alleged onset date; (2) the soft tissue injury to her right hand, her obesity, and her mood disorder constitute severe impairments, but her blurred vision, irritable

bowel syndrome, RSD, poor balance, lower extremity pain, and back and neck pain are non-severe impairments; (3) her severe impairments do not individually or collectively meet or medically equal any of the listings; (4) Archibald has the RFC to perform medium work, except that she can reach only occasionally and "cannot understand, remember, or carry out more than detailed instructions"; and (5) she can therefore perform her past relevant work as a gate guard, which is considered to be light work. (A.R. 13-22.) Based on these findings, the ALJ concluded that Archibald is not disabled as defined by the Act, and denied her benefits. (Id. at 22.)

## Analysis

In her motion for summary judgment, Archibald challenges the ALJ's decision in three respects. She first contends that the ALJ erroneously assessed her RFC when he concluded that she was able to perform a restricted range of medium work. Archibald next argues that the ALJ ignored the guidelines of Social Security Ruling ("SSR") 03-02p. Finally, Archibald asserts that the ALJ failed to comply with SSR 86-62 when he neglected to identify the physical and mental demands of her past relevant work as a gate guard.

This court confines its review to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)), and examines whether the ALJ's decision is supported by substantial evidence, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869. But remand is warranted if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele*, 290 F.3d at 940, or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotation marks omitted).

## A.    The ALJ's RFC Finding

The ALJ concluded that Archibald has the RFC to perform medium work, except that she can only occasionally reach and "cannot understand, remember, or carry out more than detailed instructions." (A.R. 15.) Archibald challenges this RFC assessment, arguing that it is not supported by substantial evidence. Archibald further contends that the ALJ failed to provide a narrative discussion that sufficiently explains how her reported systems and functional limitations are inconsistent with the medical evidence.

Beginning with the question of whether the ALJ's RFC assessment is supported by substantial evidence, at the outset, the court notes that the ALJ found that Archibald has the RFC to perform restricted medium work. In doing so, the ALJ necessarily found that Archibald also has the RFC to perform light work. 20 C.F.R. § 404.1567(c) (assuming if claimant can perform medium work, she can also perform light work). The regulations define medium work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). By contrast, light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). The ALJ's finding that Archibald can perform medium work is relevant here because the ALJ found at step four that Archibald is capable of performing her past work as a gate guard, classified by the VE as light work. As explained below, the court finds that the ALJ's RFC determination that Archibald can perform light work is supported by substantial evidence. Whether Archibald has the ability to perform medium work is a closer question. But because Archibald's ability to perform light work is supported by substantial evidence, ultimately this

court can affirm the determination that she is not disabled. *See Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (upholding disability determination where substantial evidence supported finding that claimant could perform sedentary work even where finding that claimant could perform light work was a "closer question") (citing with approval *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988) (holding that although determination that claimant could perform light work was not supported by substantial evidence, ruling could be affirmed because substantial evidence supported conclusion that claimant could perform sedentary work)).

The objective medical evidence supports an RFC finding that Archibald can perform light work. The medical testing returned normal findings. (A.R. 392, 413, 416, 424, 425.) Dr. Tulipan, an orthopedist, concluded that Archibald had a pain management problem, noting that her pain was out of proportion to the injury she sustained. (Id. at 319.) When Archibald requested stronger medication for her pain, Dr. Ling, her treating physician, declined to prescribe it, informing her that no surgical intervention was available and recommending pain management treatment. (Id. at 392-94, 435). Dr. Yang, a pain management specialist, had a similar observation as Dr. Tulipan, noting that Archibald's pain was out of proportion to her injury. (Id. at 348.) While he observed that Archibald had severely limited range of motion and grip strength in her right hand, he also noted that her right upper extremity motor strength was intact and that she had full range of motion in her cervical spine. (Id.) Despite Archibald's continued requests, Dr. Ling declined to prescribe stronger pain medication, instead she recommended pain management treatment. (Id. at 457,

462.)  Dr. Ingberman concurred, diagnosing her with chronic pain syndrome.  (Id. at 472, 476.)  At the end of intensive pain management therapy, the doctor noted, Archibald would be at maximum medical improvement.  (Id.)  Declining to issue a note excusing her from work, the doctor added that even with her limitations, she might be able to work some jobs.  (Id. at 474.)  Additionally, the state agency physician who evaluated Archibald limited her to light exertional work, though he noted that she could not use her right hand or arm.  (Id. at 437-44.)  And although the ALJ declined to give this assessment great weight because additional evidence was submitted after his review of the record, the ALJ noted that his opinion supports the determination that Archibald has the RFC to perform light work and ultimately that she is not disabled.  (Id. at 21.)

In addition to the medical evidence, further supporting, and indeed, key to the ALJ's RFC determination that she could perform light work, was his discrediting of certain of Archibald's allegations regarding her functional limitations (on which she relies to support her claim she cannot perform light work) as exaggerated.  (A.R. 20.)  The ALJ pointed to several objective and subjective factors influencing his determination that some of Archibald's symptoms were exaggerated, including: (1) the fact that she performed her past work as a gate guard for over a year after she injured her hand; (2) the medical findings that her subjective complaints were disproportionate to the objective findings; (3) the fact that she was hypersensitive to even light touch; (4) notes from Dr. Ling documenting her continued requests for additional narcotic pain medications, despite knowing that Dr. Ling would not write those prescriptions; (5) Dr. Ingberman's observations that Archibald was less guarded

with her right upper extremity when distracted, that she did not complain during the muscle stretch reflex testing but became hypersensitive to light touch, and that she was exhibiting "exaggerated pain behavior" during the examination; and (6) the ALJ's personal observations that she had no "facial grimaces or any other looks of distraction or discomfort during the hearing while changing her posture." (A.R. 20.) Considering all these factors, the ALJ properly discounted certain of Archibald's allegations as not credible. And significantly, Archibald makes no challenge to the ALJ's credibility determination as "patently wrong." *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012).

Archibald's testimony regarding her activities of daily living and her description of her past work as a gate guard, both of which were appropriate factors for the ALJ to consider in crafting her RFC, further support the determination that she can perform light work. *See* SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996); *Williams-Overstreet v. Astrue*, 364 Fed. Appx. 271, 276-77 (7th Cir. 2010). The ALJ noted that Archibald testified to very limited activities of daily living but contrasted that testimony with the Third Party Function Report completed by Archibald's mother in which she noted that Archibald spent time on the computer daily taking an online course, socialized with her friends, cared for her cat, shopped, and did laundry, ironing, and light cleaning. (A.R. 16.) Ultimately, the ALJ concluded that Archibald has no restrictions in activities of daily living and no difficulties in social functioning. (Id. at 14.) At the minimum, the ALJ noted, Archibald's testimony established that she was able to care for herself. Indeed, she testified that she had recently moved to Arizona, lived by herself, and took care of her home. (Id. at 42-44, 47-48.) The

ALJ thus observed that any limitation in social functioning or daily activities would be inconsistent with Archibald's own description of her social activities and ability to care for herself.

The ALJ also reasonably relied on Archibald's ability to work at her past job as a gate guard for over a year after her hand injury as evidence that her impairments do not limit her as much as she complained. *See Williams-Overstreet*, 364 Fed. Appx. at 276-77. Even though Archibald performed this work on a part-time basis, the ALJ noted that she worked part-time not due to restrictions from her impairments but because those were the only hours she was able to secure. (A.R. 20.) What's more, Archibald testified that her work as a gate guard at a retirement home—a job she performed for over a year after her injury—consisted of her mainly sitting at her desk, greeting visitors, giving directions, observing those entering and exiting the building, and sometimes pushing patients in their wheelchairs to their destinations. (Id. at 34-36.) Her work history reports characterized the functional demands of the position as requiring her to walk and stand for six hours per day; lift and carry less than ten pounds frequently or occasionally; handle, grab, and grasp big objects eight hours per day; and reach or handle small objects eight hours per day. (Id. at 213-14, 244.) They also noted that the position did not require any technical knowledge or skills, she did not supervise other individuals in this position, and she was not a lead worker. (Id.) The VE testified that this job was a light exertional job, at the low end of semiskilled, requiring no more than occasional reaching and handling. (Id. at 83-84.) The testimony of Archibald and the VE regarding the functional limitations of that work and her ability to perform it for a

time supports the RFC finding that Archibald is capable of doing light work. Accordingly, in light of the record and testimonial evidence (and credibility), which the ALJ considered, the ALJ's assessment of Archibald's capability to perform light work is supported by substantial evidence.

As for SSR 96-8p's requirements, the guidelines require that the ALJ include in the RFC assessment "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." 1996 WL 374184, at *7. In other words, the "RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Although the ALJ "has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of nondisability . . . an ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Contrary to Archibald's claims, the ALJ satisfied SSR 96-8p's requirements. Indeed, the ALJ thoroughly recounted the record evidence and explained why he did not find that Archibald's impairments prevent her from working. He observed that Archibald had not sought the type of treatment an individual would seek given her allegations of totally disabling impairments, and noted that Dr. Ling determined that after cortisone injections and physical therapy, she did not require any surgical intervention or further treatment. (A.R. 21.) The ALJ also observed that although Archibald complained of a decreased memory,

poor concentration, and poor sleep, she never sought any formal mental treatment or medications, nor sought treatment from a primary care physician for her mental health symptoms or pain. (Id.) The ALJ further considered and discussed the non-medical evidence. As discussed above, he noted Archibald's daily activities, including her ability to occasionally drive and care for herself and her home, and her past part-time work, concluding that these were factors that supported a finding that her impairments were not so severe as to prevent full-time work. (Id.) In all these ways, the ALJ adequately matched up his assessment of Archibald's RFC to the record, testimonial evidence, and nonmedical evidence. *See Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009).

Archibald's remaining attacks on the RFC assessment center on her assertions that the ALJ failed to recognize that she walked with a cane, used a brace on her right hand, had difficulty gripping and pushing patients in wheelchairs, experienced side effects from her medications, napped two to three times a day, and had difficulty concentrating. But the ALJ's opinion rebuts this, demonstrating that he considered Archibald's allegations (id. at 16-17), and to the extent that he found them credible (id. at 17, 20-21), accommodated the credible limitations by restricting her physical RFC to occasional reaching and handling and mental RFC to work not requiring her "to understand, remember, or carry out more than detailed instructions" (id. at 15.) For all of these reasons, this court concludes that the ALJ's RFC assessment is supported by substantial evidence.

**B.     SSR 03-02p Guidelines**

Archibald next claims that the ALJ failed to apply the guidelines in SSR 03-02p, which discuss how to evaluate cases involving RSDS and CRPS. According to Archibald, the ALJ failed to discuss the clinical signs that she suffers from this impairment—the presence of which was corroborated by her examining physicians Drs. Ingberman, Ling, and Yang, state agency psychologist Dr. Hakimi, and state agency consulting physician Dr. Aquino—and the side effects of her medications. She also faults the ALJ for failing to consider the side effects of her medications, which included short-term memory loss, gastrointestinal problems, and daily naps lasting two to three hours. Finally, Archibald claims that the ALJ misconstrued the testimony of Dr. Semerdjian, the ME in this case. Although not explicitly argued by Archibald, it appears that by making these arguments, she means to challenge the ALJ's determination at step two that her RSDS/CRPS is not a severe impairment. (R. 16, Pl.'s Mot. at 6.)

SSR 03-2p defines RSDS/CRPS as "a chronic pain syndrome most often resulting from trauma to a single extremity."[2] 2003 WL 22399117, at *1 (Oct. 20, 2003). "A diagnosis of RSDS/CRPS requires the presence of complaints of persistent, intense pain that results in impaired mobility of the affected region." *Id.* at *2. Pain, swelling, extreme sensitivity to touch or pressure, abnormal sensations of heat or cold, and involuntary movements of the affected region can be associated with this disorder. *Id.* at *2, 4. SSR 03-2p recognizes that the disorder may progress beyond the limb or body area originally

---

[2] SSR 03-2p uses the terms RSDS and CRPS synonymously.

involved and manifest in pain that is out of proportion to the severity of the sustained injury. *Id.* at *2. SSR 03-2p describes how to evaluate disability claims based on RSDS/CRPS, providing that "[c]laims in which the individual alleges RSDS/CRPS are adjudicated using the sequential evaluation process, just as for any other impairment." *Id.* at 6. "Given that a variety of symptoms can be associated with RSDS/CRPS, once the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* If the ALJ determines that "the pain or other symptoms cause a limitation or restriction having more than a minimal effect on the individual's ability to perform basic work activities, a 'severe' impairment must be found to exist." *Id.* Once the ALJ finds a severe impairment, the ALJ next considers whether that impairment meets or equals a Listing, and if it does not, determines a claimant's RFC. *Id.* at *6-7.

Here, at step two, recognizing that a non-severe impairment is a "slight abnormality . . . that has no more than a minimal effect on the claimant's ability to do basic work activities," the ALJ concluded that Archibald's RSDS/CRPS did not "significantly impede her functional abilities in the workplace." (A.R. 14.) Accordingly, the ALJ found that Archibald's RSDS/CRPS, among others, are not severe impairments. (Id.) The ALJ concluded though that the soft tissue injury to her right hand, her obesity, and her mood disorder are severe impairments. (Id. at 13-14.) After reaching this conclusion, he determined her RFC and found that she was able to perform her past work. (Id. at 14-22.)

The ALJ did not, as Archibald claims, fail to consider the clinical signs of her RSDS/CRPS. Rather, the ALJ thoroughly recounted Archibald's treatment and examination history with Drs. Ling, Yang, and Ingberman, her reported symptoms, and their findings. (A.R. 17-19.) Also in the ALJ's opinion is an extensive discussion of Dr. Hakimi's examination and her diagnosis of depressive reaction secondary to a chronic medical condition. (Id. at 19-20.) The ALJ further considered the opinion of Dr. Aquino, noting that his opinion supported a finding of disability, but declined to afford it much weight since new evidence was admitted after he rendered it. (Id. at 21.) A reading of the ALJ's opinion additionally reveals that the ALJ considered the side effects that Archibald complains he ignored. (Id. at 14, 16.) The ALJ thus did not fail to consider the symptoms and factors Archibald points to, but rather rejected her allegations regarding these signs as not fully credible or supported by the medical evidence. (Id. at 17, 20.)

Archibald's claim regarding the ALJ's misinterpretation of Dr. Semerdjian's testimony, on the other hand, has some traction. The ALJ stated that, "[a]fter reviewing the record, including the claimant's testimony, the ME testified that the clamant does not have a medically determinable impairment resulting in CRPS or RSD according to SSR 03-2p." (Id. at 21.) But a review of Dr. Semerdjian's testimony reveals his opinion to be not as definitive as the ALJ believed. Characterizing her impairment as a soft tissue injury to her right hand, Dr. Semerdjian noted the conflicting opinions regarding whether Archibald suffers from CRPS or chronic pain syndrome with a significant overlay of psychological factors. (Id. at 54-55, 79.) Explaining that a diagnosis of CRPS is a "tough one to make,"

he stated that "there are not any specific tests" that will confirm such a diagnosis, instead "just a complex [set] of findings." (Id. at 52.) He testified that if Archibald's examining doctors "used the classic criteria" to evaluate her, "then she has [CRPS], and she has reasons for having pain which is probably amplified by psychological factors." (Id. at 54-55.) But the ME also testified that he was "not in a position" to say whether Archibald has CRPS. (Id. at 54.) Dr. Semerdjian therefore does not appear to have conclusively testified that Archibald does *not* suffer CRPS/RSD, contrary to the ALJ's ruling.

But any error by the ALJ in this regard is immaterial to the ALJ's ultimate decision for even if the ALJ misinterpreted the ME's testimony, which led, in part, to erroneously finding Archibald's RSDS/CRPS as a non-severe impairment at step two, any error was harmless. *See Henke v. Astrue*, No. 12-2364, 2012 WL 6644201, at *4 (7th Cir. Dec. 21, 2012). Although the ALJ determined that Archibald's RSDS/CRPS is not a severe impairment, he also concluded that she suffers from a number of severe impairments. (A.R. 13-14.) He then proceeded to step four, and considering both her severe and non-severe impairments, determined her RFC. (Id. at 15.) Given the ALJ's alternate finding at step four that Archibald could perform her past work (id. at 21)—a determination the court upholds as supported by substantial evidence—any error in the step-two severity determination was harmless. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012); *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010).

## C.    SSR 82-62

Finally, Archibald argues that the ALJ did not comply with SSR 82-62 when he failed to make specific findings about the physical and mental demands of her past relevant work as a gate guard. SSR 82-62 requires that an ALJ analyze the specific physical requirements of a claimant's previous job, and "assess, in light of the available evidence, the claimant's ability to perform these tasks." *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991) (citing *Strittmatter*, 729 F.2d at 509); *see also* SSR 82-62, 1982 WL 31386, at *4 (1982) (requiring ALJ to make findings of fact as to individual's RFC, physical and mental demands of past occupation, and that individual's RFC would permit return to past occupation). An ALJ may not "describe a claimant's job in a generic way . . . and conclude on the basis of the claimant's residual capacity, that she can return to her previous work." *Nolen*, 939 F.2d at 518. In other words, an ALJ cannot describe a job as "sedentary," "light," or "medium" and then conclude that the claimant is fit to perform that job without inquiring into what the job requires. *See Cohen v. Astrue*, 258 Fed. Appx. 20, 28 (7th Cir. 2007) (citing *Smith v. Barnhart*, 388 F.3d 251, 252-53 (7th Cir. 2004) (finding reversible error where ALJ failed to consider whether claimant could perform duties of specific jobs she held and equated claimant's past relevant work to sedentary work in general)).

That is not what the ALJ did here. During the hearing, the ALJ questioned Archibald regarding the demands of her past work as a gate guard (A.R. 32-38), and he discussed Archibald's testimony and her characterization of the functional demands of this job in his opinion (id. at 22). The ALJ also discussed the VE's testimony (id.), which he elicited at the hearing, that Archibald's past work as a gate guard was a light exertional job that required

only occasional reaching and handling (id. at 83-84). The record thus rebuts Archibald's contention that the ALJ failed to identify facts describing the demands of her previous job as a gate guard or provide an assessment of her ability to perform those specific tasks. Indeed, the ALJ's opinion demonstrates that he went beyond a generic description of Archibald's past work as "light." He was presented with and in fact considered the specific demands of that work and determined whether her RFC—with the physical restriction that she can only occasionally reach and mental restriction that she cannot understand "more than detailed instructions"—allowed her to perform the job. Considering the VE's testimony, the ALJ compared the functional requirements of Archibald's past work (including Archibald's description of those requirements) to her functional capabilities, and concluded that she was capable of performing the physical and mental demands of that work with certain restrictions. Accordingly, the court finds that the ALJ satisfied the requirements of SSR 82-62 and that the ALJ's step four determination is supported by substantial evidence.

## Conclusion

For the foregoing reasons, Archibald's motion for summary judgment is denied, and the decision of the Commissioner is affirmed.

ENTER:

Young B. Kim
United States Magistrate Judge